**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ian Gage, | No. CV-19-02745-PHX-DLR |
| Plaintiff, | **ORDER** |
| v. | |
| Midwestern University, | |
| Defendant. | |

Before the Court is Defendant Midwestern University's ("University") Motion for Summary Judgment (Doc. 44). The motion is fully briefed and for reasons set forth herein is granted.

Preliminarily, Plaintiff Ian Gage's 34-page response far exceeds the Court's page limit and contains many irrelevant and duplicative allegations and facts. The Court notes the University's request to strike but in its discretion denies the request. Some of the exhibits attached to the response are not shown to be made on personal knowledge and/or do not set out facts that would be admissible in evidence, as required by Federal Rule of Civil Procedure 56(c)(4). However, there has been no objection to them. Despite the University's representation that the motion is supported by undisputed facts, there are facts that Gage disputes. The Court has construed the facts in the light most favorable to Gage.

**I.     Background**

Gage was hired effective July 17, 2017 as a Pathology Case Coordinator at the

Diagnostic Pathology Center ("DPC") in the University's College of Veterinary Medicine. As the Pathology Case Coordinator, Gage's job description provided in this case by the University included bagging fixed tissue, cleaning the laboratory, and handling formalin. (Doc. 44-1 at 12-14; Doc. 44-3 at 2-3.) Gage disagrees with that job description because the job description he reviewed online before he was hired stated the duties pertaining to necropsy and histopathology as "'duties requiring minimal technical skill' in that the plaintiff will be cross 'trained' to do some of these duties." (Doc. 54 at 4.) Gage's Declaration (Doc. 54-1 at 2-7) does not indicate this, but he argues in his response that he understood that the on-line job description indicated he should have received "advanced training to handle formaldehyde, which he did not." (*Id.*) Gage was provided access to the DPC safety manual, training, and personal protective equipment. (Doc. 44-1 at 27-35; Doc. 44-3 at 2-3.)

Gage's supervisor, assigning tasks and providing day-to-day instruction, was Dr. Brower. (Doc. 54 at 2; Doc. 54-1 at 2-3.) Gage accompanied Dr. Brower to the Arizona Cattleman's Association and was told to dress like a "white male conservative . . . like you have been dressing since starting here." Gage was given an office hit by the direct sun light and assigned by Dr. Brower to receive and move animals and to perform the necropsies, specifically decapitating the animals and removing the brains. Dr. Brower had him order, receive, and set up her lunches. (Doc. 54-1.) During a group meeting, Dr. Brower dismissed Gage's complaints about Mr. Griffin's alleged attendance issues by changing the subject and saying, "men do not know how to communicate" and "[I do] not know how the world got this far with men in control." (*Id*.)

On October 30, 2017, Gage requested a meeting with the University's Human Resources ("HR") department. At this meeting, he presented an 11-page "Safety Complaint." (Doc. 44-4 at 2-3; Doc. 44-5.) Gage later orally presented his safety concerns to several members of management, including Dr. Brower and her supervisors. Gage's "main concerns" included a lack of safety in the DPC that he felt exposed everyone to hazards, the University's resistance to complying with laws concerning safety and

"chemical waste disposal," the requirement that he perform tasks belonging to others, and an unfair evaluation. (Doc.44-5.) Other concerns expressed in his Safety Complaint included a lack of safety protocols and procedures for handling formaldehyde and his general disapproval of DPC operations. (*Id*.) The Safety Complaint did not indicate that Gage had suffered ill effects from exposure to formaldehyde. (Doc. 44-5.)

Gage's Safety Complaint also criticized Dr. Brower. (*Id.* at 7.) The University met with Gage on November 8, 2017. (Doc. 44-4 at 2-3.) The University placed Gage on paid administrative leave effective that same day. (*Id*.) Gage was escorted to his car from the meeting room and not allowed access to his desk before leaving. (Doc. 54 at 8.) The University indicated it would conduct an internal investigation concerning the concerns set out in Gage's Safety Complaint. During administrative leave, Gage was paid his regular pay and elected benefits and otherwise maintained all terms and conditions of his employment including a pay increase. (*Id*.; Doc. 44-7.)

On December 4, 2017, the University hired a safety expert to evaluate the DPC. (Doc. 44-1 at 5-6; Doc. 44-2; Doc. 44-4.) The safety expert's report would be finalized on February 7, 2018. During that period, Gage requested updates and consistently reasserted his concerns about safety requesting another opportunity to present his Safety Complaint.

On December 19, 2017, Gage disclosed the ill effects he suffered from exposure to formaldehyde. "As a result of this and multiple other disregards [sic], I experienced overexposure to formaldehyde which has led to multiple hospital stays and long-term health effects." (Doc. 44-2 2-3; Doc. 44-4 Ex. 42-4.) After completing the safety reviews, the University concluded Gage's concerns were unsubstantiated and the DPC was a safe work environment. (Doc. 44-1 1 at 7-9; Doc 44-2 2 at 2-3; Doc. 44-4 at 3-5.) Gage, however, disagreed with that finding. (Doc. 54 at 10.)

The University HR, represented by Amy Gibson, Director, met with Gage on February 23, 2018, to inform him that the DPC was safe, discuss his Safety Complaint, and plan his return to work. (Doc. 44-2 at 4; Doc. 44-4 at 1-3.) Gage alleged that the internal investigation was illegitimate and re-stated his concerns identified in the Safety Complaint.

(*Id.*)  Ms. Gibson provided Gage with information concerning his insurance coverage for the medical evaluation.  (Doc. 44-2 at 2-3.)  Gage was provided information on filing a workers' compensation claim.  (*Id.*; Doc. 44-4 at 2-3.)  Gage did not get the tests but continued to express his concerns about safety.  (Doc. 44-2 at 4-5.)

On March 13, 2018, the Arizona Division of Occupational Safety ("ADOSH") issued a citation and a $1625.00 penalty to the University regarding an inspection conducted on January 3, 2018 for a "Serious" violation regarding the requirement to identify all employees who may be exposed at or above the action level or at or above the short-term exposure limit ("STEL") for formaldehyde.

Ms. Gibson and Ms. Reed met with Gage on March 16, 2018, to again discuss his return to work.  Gage reiterated his concerns about safety and how he believed the DPC was unsafe. (Doc. 44-2 at 2-4; Doc. 44-4 at 5.) Gage provided a doctor's note dated January 23, 2018, which stated that "Mr. Gage should not work with formaldehyde at all." It provided no information as to why.  The meeting ended with no resolution as to when Gage would return to work.  Gage continued to send the University emails about his safety concerns.

In a March 22, 2018, communication, Ms. Gibson explained to Gage the type of information needed to substantiate a disability—especially since Gage had claimed a long list of ailments such as headaches and impairment with his lungs, liver, vision, and back—and the required accommodations to perform the essential functions of his job.  (*Id.*)  She also attached a copy of his job description to assist Gage in procuring the required information.  (*Id.*)  Ms. Gibson reminded Gage that the purpose of his paid administrative leave had ended, and he was expected to cooperate with the disability-related inquiry.  (*Id.*)  Ms. Gibson also informed Gage that the safety investigation had ended and the University could not extend his paid administrative leave indefinitely. (*Id.*)

The University placed Plaintiff on unpaid administrative leave effective at the close of business March 23, 2018.  The University requested Gage submit the requested paperwork so he could return to work. (*Id.*) Gage then provided the University with a

doctor's letter dated April 2, 2018, stating that he had been seen for "symptoms of coughing, wheezing, eye irritation, rash and fatigue." (Doc. 44-2 at 8-9.) Ms. Gibson told Gage that the letter was insufficient because it only identified symptoms. The letter did not state the nature, severity, or duration of his condition and omitted information about his impairment limits, how it would affect his job, or what accommodations were required. (*Id*.) Ms. Gibson informed Gage of the March 22, 2018, communication which provided further explanation and guidance. (*Id.*) Ms. Gibson told Gage that the University could not engage in the interactive process without the requested information. (*Id*.)

Gage's medical records show that he told his medical providers of an occupational exposure to formaldehyde and having chemical sensitivity. (Doc. 44-8.) Gage's medical records show that there is no method to test for formaldehyde exposure, and that a determination that Gage suffered from formaldehyde overexposure is based on his complaints and the history he provided his doctors. Gage's medical records do not indicate that he suffers from chemical sensitivity. (*Id.*)

Instead of providing the University with the information it requested to support his claims of sensitivity or overexposure to formaldehyde, Gage continued to respond as before but also added a demand for proof that the DPC was safe. (Ex. 44-2 at 9-10.) That was consistent with his past behavior, where during his employment with the University Gage made repeated complaints of exposure to formaldehyde and requests for accommodation for working with formaldehyde including closed containers, PPE, monitors, and training from August 22, 2017, right up to the day he was terminated, April 10, 2018. (Doc. 44-99 at 11-29.) He stated that he would construe the University's failure to provide him such proof as an unlawful act of discrimination because the University was refusing to engage in an interactive process allegedly required by Occupational Safety and Health Administration ("OSHA") regulations. (*Id*.; Doc. 44-9.) Thereafter, the University terminated Gage effective April 10, 2018. (Doc. 44-2 at 10.)

**II.     Legal Standard**

Summary judgment is appropriate when there is no genuine dispute as to any

material fact and, viewing those facts in a light most favorable to the nonmoving party, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case, and a dispute is genuine if a reasonable jury could find for the nonmoving party based on the competing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the non-movant to establish the existence of a genuine and material factual dispute. *Id.* at 324. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts[,]" and instead "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation and citation omitted).

**III.  Discussion**

Gage's complaint alleges one count of sex discrimination in violation of Title VII and one count of disability discrimination in violation of the American with Disabilities Act ("ADA"). (Doc. 1.) The factual allegations in the complaint, however, go further than the counts alleged in the complaint. They include a claim of sex-based harassment and a claim of retaliation. Gage seeks $200,000 in damages "for emotional pain, suffering, inconvenience, mental anguish, [and] loss of enjoyment of life." (*Id.*) He also seeks "treble punitive damages" along with equitable relief. (*Id.*)

**A. Sex Discrimination**

To prove a Title VII claim of sex discrimination, a plaintiff must prove that he (1)

belongs to a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *Moran v. Selig,* 447 F.3d 748, 753 (9th Cir. 2006). A prima facie case does not require proof by a preponderance of the evidence. Minimal evidence of discriminatory intent will suffice so long as it is evidence that "give[s] rise to an inference of unlawful discrimination," either through the framework set forth in *McDonnel Douglas . . .* or with direct circumstantial evidence of discriminatory intent." *Vasquez v. Cnty. of L.A.,* 349 F.3d 634, 640 (9th Cir. 2004) (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)).

Once a plaintiff establishes a prima facie case, "the burden of production, but not persuasion, then shifts to" the defendant to offer a legitimate non-discriminatory reason for the adverse employment action. *Chuang v. Univ. of Cal.-Davis, Bd. of Trs.*, 225 F.3d 1115, 1123-24 (9th Cir. 2000). If the defendant can show a non-discriminatory reason for its action, the burden shifts back to the plaintiff to "show that [the] stated reason for [the challenged action] was in fact pretext." *McDonnell Douglas,* 411 U.S. at 804. "Uncorroborated and self-serving" testimony does not create a genuine issue of fact. *See Kennedy v. Applause, Inc*., 90 F.3d 1477, 1481 (9th Cir. 1996).

The University concedes that Gage has established the first two *McDonnel Douglas*. factors. Gage is a member of a protected class and was qualified for his position. The sex discrimination claim turns on whether there is evidence that Gage was subject to an adverse employment action, whether there is evidence that the termination was the result of sexual animus, and whether there is evidence of discriminatory intent.

Gage's evidence is contained in the arguments of his response. Other than the uncorroborated and self-serving statements contained in his affidavit (Doc. 54-1), Gage has offered no evidence that supports his claim that similarly situated individuals outside his protected class were treated more favorably. His dissatisfaction with the type of tasks he was assigned does not show that similarly situated individuals outside his protected class

were treated more favorably.

Gage's evidence of the tasks he was assigned, the office he was given, and his recollection of what Dr. Brower allegedly said during meetings ("men do not know how to communicate" and "[I do] not know how the world got this far with men in control") are not evidence of a discriminatory intent because there is no nexus between the remarks, the job assignments, and the decision to terminate Gage. *See Vasquez,* 349 F.3d at 640. The University is entitled to summary judgment on this claim.

### B. Hostile Work Environment

To prove a Title VII claim of hostile work environment, a plaintiff must prove that he (1) was subjected to verbal or physical conduct because of his sex, (2) the conduct was unwelcomed and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. *Mannatt v. Bank of Am., N.A.*, 339 F.3d 792, 798 (9th Cir. 2003). When determining whether the conduct is sufficiently abusive to prove the claim, courts look to "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)

Plaintiff argues that the evidence of a hostile environment is the "very nature of the tasks [assigned him]." He claims they "were aimed at humiliation and had the ultimate intent of physically causing injury…. assigning more time handling toxic chemicals among other tasks he should have never been assigned." (Doc. 54 at 26.) He asserts that Dr. Brower knew "of his disapproval [of the tasks he was assigned] and that the conduct [presumably the sexist comments Gage attributed to Dr. Brower about men in general] was unwelcomed." (*Id.*)

Plaintiff's job duties included bagging fixed tissue, cleaning the laboratory, and handling formalin. He was also tasked with ordering lunches and scheduling Dr. Brower's lunches. That he was expected to perform duties arguably outside his job description does not establish that he was given that job assignment because of his sex or to humiliate or

demean him.

The alleged comment by Dr. Brower was not threatening or humiliating and did not interfere with Gage's work performance. The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher,* 524 U.S. at 788. The alleged comments are not objectively offensive and are not so unreasonable to create conditions in the workplace that pollute or alter the conditions of employment. *Manatt,* 339 F.3d at 798; *see also Brooks v. City of San Mateo,* 229 F.3d 917, 926 (9th Cir. 2000) ("If a single incident can ever suffice to support a hostile work environment claim, the incident must be extremely severe."). The alleged incident of these comments cannot, even assuming the facts in the light most favorable to Gage, be determined to be "extremely severe." The University is entitled to summary judgment on this claim.

**C.  ADA Discrimination**

"The ADA prohibits an employer from discriminating against a qualified individual with a disability 'because of the disability.'" *Nunes v. Wal-Mart Stores, Inc*., 164 F.3d 1243, 1246 (9th Cir. 1999) (quoting 42 U.S.C. § 12112(a)). To prove a claim of disability discrimination a plaintiff must show that (1) he is disabled within the meaning of the ADA, (2) that he is qualified, with or without an accommodation, to perform the essential functions of the job, and (3) that his employer denied a reasonable accommodation for his disability or subjected him to an adverse employment decision solely because he is disabled. *Bradley v. Harcourt, Brace and Co*., 104 F.3d 267, 270-71 (9th Cir. 1996). When an employee alleges failure to accommodate, the employee maintains the burden of proving the reasonableness of an accommodation and the employer bears the burden of proving undue hardship. *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 401-02 (2002). "If the employer disclaims any reliance on the employee's disability in having taken the employment action, *McDonnell Douglas* Title VII" burden-shifting analysis applies. *Mustafa v. Clark Cnty. Sch. Dist.,* 157 F.3d 1169, 1175-76 (9th Cir. 1998).

With respect to the first prong, a "disabled person" is defined by the ADA as an

individual who has "a physical or mental impairment that substantially limits one or more of the individual's major life activities." *Coons v. Sec'y of U.S. Dep't of Treasury,* 383 F.3d 879, 884 (9th Cir. 2004). "An impairment covered under the ADA includes any physiological disorder," *Id.*, and "major life activities" includes "standing," "sitting," and "lifting," 29 C.F.R. § 1630.2. "Substantially limited" means that a person is "significantly restricted as to condition, manner or duration under which [she] can perform [the] particular major life activity as compared to . . . [an] average person in the general population." *Coons*, 383 F.3d at 885. "Temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities." *Wilmarth v. City of Santa Rosa*, 945 F.Supp. 1271, 1276 (N.D. Cal. 1996).

Gage's ADA claim relies on a doctor's note dated January 23, 2018 provided to the University in March 2018 and a doctor's note dated April 2, 2018. (Doc. 54-2 at 31.) The January note says, "Mr. Gage should not work with formaldehyde at all." The April 2, 2018 note provides that Mr. Gage was seen "for symptoms of coughing, wheezing, eye irritation, rash and fatigue. . . . Symptoms have somewhat improved after he stopped working with Formaldehyde. The above symptoms are classic with exposure to Formaldehyde. Under no circumstances, Mr. Gage should have continuous exposure to this chemical. There is no specific test that shows this connection except history of symptoms[.]" (*Id.*)

The doctors' notes do not establish that Gage is disabled within the meaning of the ADA. Neither note states that Gage has a physical or mental impairment. The April 2018 letter talks of symptoms that appear to have involved the respiratory system. The ADA covers any disorder or condition affecting body systems such as the respiratory systems. 29 C.F.R. § 1630.2(H). However, the letters do not indicate that the symptoms of which Gage complained were anything more than temporary. Neither note states that his complaints about his reaction to formaldehyde is disabling or permanent. In fact, the April 2, 2018 note states that his symptoms improved after he stopped working with

formaldehyde.

The doctors' notes do not state that Gage's exposure to formaldehyde and his transient respiratory symptoms resulted in substantially limiting a major life activity, as required by the ADA. A major life activity is a function "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(J). To have a record of an impairment that substantially limits a major life activity means to have a history of "a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). "The record must be of an impairment that substantially limits a major life activity." *Heisler v. Metro. Council*, 339 F.3d 622, 630 (8th Cir. 2003).

Gage has not argued or presented evidence that the University mistakenly regarded him as having a physical impairment limiting any major life activities. A person may be regarded as disabled under the ADA if "a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major activities[.]" 29 C.F.R. § 1630.2(l)(1). The evidence in the record shows that the University did not consider him impaired but was seeking further information to understand the state of Gage's condition. The University was seeking information on a diagnosis and the basis of Gage's claim that he was disabled. The employer is entitled to obtain information about the alleged disability. *See, e.g.*, *Collings v. Longview Fibre Co.,* 63 F.3d 828, 833-35 (9th Cir. 1995). The doctor's notes expressing the symptoms based on Gage's subjective complaints and history do not, in and of themselves, amount to a notice of disability and there is no evidence that the University considered it as notice. Gage is not a disabled person under the ADA. The University is entitled to summary judgment on this claim.

### D. Retaliation

A finding that Gage is not disabled under the ADA does not exclude the possibility that he could have been subjected to retaliation for pursuing an accommodation pursuant to the ADA. "[T]he ADA prohibits an employer from retaliating against an employee who seeks an accommodation in good faith." *Heisler*, 339 F.3d at 630 n. 5.

To make a prima facie case of retaliation, a plaintiff must present evidence showing: "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Brown v. City of Tucson,* 336 F.3d 1181, 1187 (9th Cir.2003) (citation and quotation marks omitted). A plaintiff must offer "evidence adequate to create an inference that an employment decision was *based on* an illegal discriminatory criterion." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (emphasis modified) (citation and internal punctuation omitted). Retaliation claims require a "causation in fact," or a "but-for" standard. *University of Tex. Sw. Med. Ctr. v. Nassar* 570 U.S. 338, 362 (2013); *see also Murray v. Mayo Clinic,* 934 F.3d 1101, 1105 (9th Cir. 2019) (finding that plaintiff bringing claim under the ADA had to show the adverse employment action would not have occurred but for disability).

Requesting an accommodation in good faith is a protected activity. To make his prima facie case Gage needs evidence of a link between a request for reasonable accommodation and his termination. If Gage establishes a prima facie case, then the burden shifts to the University to "present legitimate reasons for the adverse employment action." *Brooks,* 229 F.3d at 928. If the University carries this burden, and Gage demonstrates a genuine issue of material fact as to whether the reason advanced by the employer was a pretext, then the retaliation case proceeds beyond the summary judgment stage. *Id.* "Circumstantial evidence of pretext must be specific and substantial." *Bergene v. Salt River Agric. Improvement & Power Dist.,* 272 F.3d 1136, 1142 (9th Cir.2001).

The record shows that Gage was well informed about the risks of working with formaldehyde and measures available to eliminate or minimize those risks. Although Gage mistakenly believed that his formaldehyde exposure amounted to disability under the ADA, there is no evidence that his requests for changes in the University's methods of handling formaldehyde were not made in good faith

The record shows that Gage made repeated complaints regarding the handling of formaldehyde. Well before he claimed an over-exposure to formaldehyde and before he claimed an ADA disability, on August 22, 2017, Gage requested closed formaldehyde

containers with a spigot. (Doc. 44-9 at 11.) Other requests included a request for PPE on August 29, 2017 and formaldehyde monitors on September 13, 2017. Although he had been seeking modifications of the methods of handling formaldehyde at the University since August 22, 2017, there was no formal request for an accommodation. For purposes of this motion, the Court will consider Gage's first request for ADA accommodation to have occurred when he submitted the Safety Complaint to the University on October 30, 2017, followed by an email alluding to Title VII discrimination and/or harassment. (Doc. 44-4 at 2-3.)

In a November 1, 2017, meeting with Dr. Patterson, Associate Dean for Clinical Education, Gage explained that he believed "Dr. Brower was intentionally subjecting" him to unsafe work conditions. (*Id.* at 12). Because Gage expressed concerns about feeling unsafe at work, the University offered, and he agreed, to administrative leave with pay while the University investigated his safety concerns. Later, on November 30, 2017, Gage notified the University of his formaldehyde overexposure diagnosis and on December 19, 2017, began the interactive process and his request for disability. *Id.* at 12-13.

On January 12, 2018, Richard Jackson, the Industrial Hygienist from ADOSH, sent an email to Dr. Brower discussing the results of a recent ADOSH inspection, stating: "There will not be any apparent violations noted during our inspection. Your facility is state-of-the-art! And your policies, procedures and staff are top notch! I was literally blown away with the ventilation engineering that went into the construction and design of your necropsy facility. It was awesome!" (Doc. 44-1 at 52.) The safety expert employed by the University to evaluate the DPC came back with a report on February 7, 2018, that did not substantiate Gage's safety concerns, finding the "facility is a low-risk operation." (Doc. 44-2 at 28-29.)

The November 8, 2017, agreed-upon administrative leave with pay while the University investigated Gage's safety concerns was not an adverse employment action. The adverse action occurred when Gage was terminated on April 10, 2018.

It was not unreasonable for the University to seek information about Gage's claim

- 13 -

of disability and ask Gage to provide further information, including the duration of the alleged disability, impact on his ability to do his assigned tasks, the needs for accommodations, and, if such a need existed, what those accommodations would be. The University's inquiry was not a pretext. In compliance with the EEOC's Enforcement Guidance on Disability-Related Inquiries, the University needed to determine if Gage was able to perform the essential functions of his job in light of his alleged impairment. The University's requests for Gage to provide additional medical information was consistent with that requirement. When Gage refused to cooperate, the University was not able to make the determination whether there were necessary accommodations and whether he was able to perform the essential job functions.

Gage has not shown by specific or substantial circumstantial evidence that the reasons given by the University for his firing are a pretext. Gage has not shown a causal connection between his termination and his Safety Complaint. The adverse action did not occur contemporaneously with or soon after Gage's protected activity. His termination occurred almost five months after he submitted his Safety Complaint.

The record shows that the results of the University's and ADOSH's investigations did not support Gage's safety concerns. The record supports the University's contention that it reasonably sought information about Gage's alleged disability and that Gage refused to cooperate in that reasonable and necessary inquiry. No reasonable juror would find that the University's explanation for Gage's termination is a pretext.

**IT IS ORDERED** that the University's Motion for Summary Judgment (Doc. 44) is **GRANTED.** The Clerk is directed to enter judgment accordingly and terminate this case.

Dated this 18th day of January, 2022.

Douglas L. Rayes
United States District Judge