**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Ian Gage, | No. CV-19-02745-PHX-DLR |
| Plaintiff, | **ORDER** |
| v. | |
| Midwestern University, | |
| Defendant. | |

At issue are Plaintiff Ian Gage's motion to compel (Doc. 130) and motion for a status conference (Doc. 148), both of which are fully briefed (Docs. 135, 136, 149, 150). As explained below, both motions are denied.[1]

**I.    Motion to Compel (Doc. 130)**

**A. Background**

Mr. Gage's complaint alleges that his former employer, Defendant Midwestern University ("the University"), discriminated against him because of his sex in violation of Title VII of the Civil Rights Act of 1964, discriminated against him because of his disability in violation of the Americans with Disabilities Act ("ADA"), and retaliated against him for engaging in activity protected by the ADA. (Doc. 1; *see also* Doc. 16 at 1–7.) Discovery closed on February 14, 2020 (Doc. 42), after which the University moved

---

[1] Mr. Gage also recently filed a motion to expedite a ruling on his motion to compel. (Doc. 142.) Because this order resolves Mr. Gage's motion to compel, the Court denies the motion to expedite as moot.

for summary judgment on all claims. (Doc. 44.) Of continued relevance, with respect to the ADA discrimination claim, the University argued that Mr. Gage lacks sufficient evidence that he is disabled within the meaning of the ADA. (*Id.* at 11–14.)

The Court granted the University's summary judgment motion. (Doc. 58.) In so doing, the Court agreed that the record lacks sufficient evidence that Mr. Gage is disabled within the meaning of the ADA. The Court explained that Mr. Gage relies principally on his doctors' notes, but that those notes "do not indicate that the symptoms of which [Mr.] Gage complained were anything more than temporary." (*Id.* at 10.) The Court also observed that "[t]he doctors' notes do not state that [Mr.] Gage's exposure to formaldehyde and his transient respiratory symptoms resulted in substantially limiting a major life activity, as required by the ADA." (*Id.* at 11.)

Mr. Gage appealed the Court's ruling. (Doc. 61.) The Ninth Circuit affirmed the Court's decision granting summary judgment to the University on Mr. Gage's Title VII claims and ADA retaliation claim. (Doc. 78-1 at 1–3.) It reversed the Court's ruling on Mr. Gage's ADA discrimination claim because, after the Court issued its decision, the Ninth Circuit released an opinion clarifying that the ADA's definition of disability is not subject to any categorical temporal limitation. (*Id.* at 4.) The Ninth Circuit therefore remanded the case for this Court to reconsider "whether [Mr.] Gage is disabled under [the ADA] and whether he has provided sufficient evidence to carry his summary judgment burden on that claim." (*Id.*) Thus, the sole remaining claim in this case is a claim that the University discriminated against Mr. Gage because of his alleged disability.

On remand, the Court held a telephonic status conference to discuss next steps. (Doc. 73.) Because a considerable amount of the original summary judgment briefing addressed Mr. Gage's Title VII and ADA retaliation claims, which had not been remanded, the Court determined that it was sensible for the parties to file supplemental summary judgment memoranda focusing solely on the ADA discrimination claim. (Doc. 82 at 4.) Both sides agreed that no new evidence would be submitted with the supplemental memoranda. Instead, the parties would ground their arguments in the existing evidentiary

1    record. (*Id.* at 6–7.)

2        Thereafter, the University filed its supplemental summary judgment brief, which

3    focused solely on the threshold issue of whether Mr. Gage is disabled within the meaning

4    of the ADA. (Doc. 74.) The University attached to its supplemental brief a copy of a

5    complaint Mr. Gage filed in a separate lawsuit against the Arizona Board of Regents. (Doc.

6    74-1.) Mr. Gage filed a supplemental response (Doc. 77) and moved to strike the exhibit

7    the University had attached to its supplemental brief, arguing that the University was

8    expanding the evidentiary record beyond what existed at the time of the original summary

9    judgment briefing (Doc. 76).

10        The Court granted Mr. Gage's request to strike the University's new exhibit but also

11    granted summary judgment for the University after finding that Mr. Gage had not presented

12    sufficient evidence to create a triable issue of fact regarding whether he is disabled within

13    the meaning of the ADA. (Doc. 85.) The Court observed that Mr. Gage relies primarily on

14    doctors' notes, and although those notes indicate that Mr. Gage had experienced symptoms

15    consistent with formaldehyde exposure, they did not state Mr. Gage has a particular

16    physical or mental impairment, nor do they show that Mr. Gage's reaction to formaldehyde

17    substantially limited any major life activities. (*Id.* at 5.) The Court also noted that Mr. Gage

18    relied on "his own email to the University summarizing . . . symptoms that he argues line

19    up with major life activities," but the Court discounted the email because it "is an unsworn,

20    uncorroborated and self-serving statement, which alone cannot create a genuine issue of

21    fact." (*Id.* at 6 (internal quotations and citation omitted).)

22        On appeal, the Ninth Circuit reversed after concluding that the Court had erred by

23    disregarding Mr. Gage's email to the University because the email reflects Mr. Gage's

24    personal knowledge, and he could testify consistent with its contents at trial. (Doc. 97-1.)

25    The Ninth Circuit remanded for the Court "to consider in the first instance whether the

26    contents of the email, in addition to the other evidence in the record, raise a genuine dispute

27    of material fact as to whether the symptoms of [Mr.] Gage's formaldehyde sensitivity and

28    his respiratory impairments substantially limit a major life activity." (*Id.* at 2.) Stated

1  otherwise, the Ninth Circuit remanded for the Court to reassess whether to grant or deny
2  the University's summary judgment motion.

3      Following this second remand, the Court held another telephonic conference to
4  discuss the Ninth Circuit's decision and how to move forward. (Doc. 95.) During that call,
5  the Court explained its understanding of the Ninth Circuit's order: "the Ninth Circuit is
6  instructing [the Court] to look at Mr. Gage's email to the [U]niversity along with his
7  doctor's notes and decide whether that evidence creates a genuine issue of material fact as
8  to whether Mr. Gage's symptoms substantially limit a major life activity." (Doc. 98 at 8.)
9  Unlike after the first remand, however, when both parties agreed not to expand the
10 evidentiary record beyond what existed at the time of the original summary judgment
11 briefing, Mr. Gage now argued that he should be permitted to supplement the evidentiary
12 record with, among other things, records of a pulmonary function test ("PFT"), and to
13 conduct some additional discovery into what he described as fraudulent acts and spoliation
14 of evidence. (*Id.* at 31.) The University disagreed that the evidentiary record should be
15 expanded but argued that the Court should permit "supplemental briefing on the narrow
16 question that the Ninth Circuit remanded to be decided[.]" (*Id.* at 41.)

17     After hearing from the parties, the Court authorized Mr. Gage to file a motion to
18 conduct additional discovery and supplement the evidentiary record. (*Id.* at 37.) The Court
19 declined to order supplemental summary judgment briefing at that time, choosing instead
20 to await the outcome of Mr. Gage's anticipated discovery motion. (*Id.* at 42.) After all, if
21 the Court denied Mr. Gage's request to conduct additional discovery and to supplement the
22 evidentiary record, there likely would have been no need for the Court to receive a new
23 round of summary judgment briefing. The Court instead could have decided whether this
24 case should proceed to trial based on the briefing that had already occurred. But if the Court
25 granted Mr. Gage's request in whole or in part, then it would be sensible to permit the
26 parties an opportunity to address that new evidence, to the extent any of it was relevant to
27 the narrow issue on summary judgment: namely, whether Mr. Gage is disabled within the
28 meaning of the ADA.

Mr. Gage thereafter filed his motion to conduct additional discovery. (Doc. 100.) The Court granted that motion in part and denied it in part. (Doc. 112.) The Court denied the portion seeking discovery into allegations that the University had engaged in retaliatory actions against Mr. Gage's mother, as well as the portion seeking discovery into allegations of fraud and spoliation of evidence. The Court permitted Mr. Gage to supplement the record with the PFT. (*Id.* at 5.) The Court also permitted Mr. Gage to serve requests for production ("RFP") of the following categories of documents: (1) unredacted copies in the University's possession of the documents produced by the Arizona Division of Occupational Safety and Health ("ADOSH") in response to Mr. Gage's Freedom of Information Act ("FOIA") requests, (2) "monitoring results for 40% formaldehyde exposure, in accordance with the Standard Operating Procedure," and (3) Mr. Gage's "statements and communications with the University or any other person or entity that are in the University's possession and that pertain to this action or the subject matter involved in this case." (*Id.* at 5–6.) Moreover, the Court directed the University to (1) provide Mr. Gage with any documents related to Mr. Gage's separate case against the University of Arizona (or a description of those documents by category and location) that the University intends to use to support its claims or defenses, (2) certify to Mr. Gage in writing that it has provided him with all medical records that the University has gathered in this litigation, and (3) provide any such medical records that might not have been provided previously. (*Id.* at 6–7.)

Because the Court permitted Mr. Gage to supplement the evidentiary record with the PFT and to engage in some limited additional discovery, the Court also permitted limited additional supplemental summary judgment briefing to afford the parties an opportunity to supplement the evidentiary record with material evidence that might be uncovered through this additional discovery. The Court made clear, however, that it:

> is not permitting the University to raise new arguments for summary judgment that were not raised in its initial summary judgment motion. The University argued that it was entitled to summary judgment on Mr. Gage's ADA discrimination claim because Mr. Gage is not disabled within the meaning of the ADA. Accordingly, the supplemental summary judgment

> briefs shall be limited to the question of whether there is sufficient evidence to create a triable issue of fact as to whether Mr. Gage is disabled within the meaning of the ADA. If the discovery authorized . . . produces evidence material to this issue, the parties may supplement the summary judgment record with that evidence.

(*Id.* at 8–9.)

Dissatisfied with the Court's ruling, Mr. Gage moved for reconsideration (Doc. 113), which the Court denied (Doc. 114).

The parties thereafter proceeded with the limited discovery the Court had authorized. On May 7, 2025, Mr. Gage emailed the University asking it to identify which (if any) of Mr. Gage's previous discovery requests it intended to respond to so that Mr. Gage could draft discovery requests for the remainder of the items covered by the Court's order. (Doc. 115 at 7.) The University responded that "there is no need for [Mr. Gage] to serve additional discovery requests," and that the University is "working on a response that addresses all of the items that the Court required [it] to produce." (*Id.* at 9.) There is no evidence that Mr. Gage contemporaneously objected to this streamlined procedure.

Five days later, the University sent Mr. Gage an email responding to each category of discovery ordered by the Court. (*Id.* at 11–13.) With respect to unredacted copies of the documents produced by ADOSH in response to Mr. Gage's FOIA requests, the University responded that it "does not possess any unredacted copies of the documents produced by ADOSH in response to your FOIA request. [The University] previously produced all records obtained from ADOSH[.]" The University then listed the Bates numbers for those previously produced records. (*Id.* at 11.) With respect to records relating to formaldehyde exposure monitoring, the University responded that it "previously produced all non-privileged documents relating to alleged formaldehyde exposure," and then listed the Bates numbers for those previously produced records. (*Id.*) With respect to medical records obtained by the University, the University certified that it previously produced to Mr. Gage all medical records it obtained from his healthcare providers in connection with this lawsuit and then listed the Bates numbers for those previously produced documents. (*Id.* at 12–13.)

Later that same day, Mr. Gage responded seeking clarification on certain matters, including (1) whether the University "no longer possesses any original ADOSH records," and (2) whether the University is withholding "monitoring results for 40% formaldehyde exposure." Mr. Gage also stated that he had "suspicion that not all collected [medical] records were disclosed." (*Id.* at 15.) Mr. Gage did not state in this email that he wanted to serve formal RFPs, nor did he otherwise object to the University's streamlined procedure for producing relevant documents. Instead, he asked the University to respond to his email by May 14, 2025 "so we can begin to bring these issues [in front] of the court[.]" (*Id.* at 16.)

With respect to the ADOSH records, the University responded that the Court's order only required it to disclose any "unredacted copies of the documents produced by ADOSH in response to Mr. Gage's [FOIA] requests," if such documents exist and are in its possession. The University then explained that it provided those records to Mr. Gage "in the same format in which they were received by [the University]," and that the University "did not redact or alter any of the records supplied by ADOSH." (*Id.* at 19.) With respect to formaldehyde monitoring records, the University clarified that its previous answer "encompasses any monitoring results for formaldehyde 40% exposure (to the extent any such documents exist)." (*Id.*) With respect to the medical records, the University reiterated that it previously turned over all medical records it obtained from Mr. Gage's medical providers. (*Id.* at 20–21.) Finally, the University advised Mr. Gage that, in the event he chose to file "a frivolous motion to compel discovery," the University would seek to recover its fees under Fed. R. Civ. P. 37(a)(5)(B). (*Id.* at 18.)

On May 15, 2025, Mr. Gage replied, articulating a different interpretation of the Court's discovery order regarding the ADOSH documents, namely that the order required the University to produce "all communications between ADOSH and [the University] relating to [his] injuries and disability, not merely FOIA responses collected." (*Id.* at 23.) With respect to formaldehyde monitoring records, Mr. Gage indicated his belief that the University was withholding relevant records. (*Id.* at 24.) With respect to medical records,

Mr. Gage indicated that he accepted the University's certification that it produced all medical records it obtained from his providers, though he remained skeptical. (*Id.* at 24.) Finally, to avoid what Mr. Gage perceived to be the University's "retaliation threat of attorneys' fees," Mr. Gage indicated that he would raise his concerns with the Court in a different way. (*Id.*) Nowhere in this email did Mr. Gage insist on serving formal RFPs, nor did he object to the University's streamlined procedure for completing the additional discovery the Court had ordered.

On May 16, 2025, Mr. Gage filed with the Court a document title "Notice of Non-Compliance on Doc 112 Order." (Doc. 115.) Although in a single sentence Mr. Gage noted that the University "failed to follow the guidelines or format of a proper FRCP 34 response" (*Id.* at 2), the mass of Mr. Gage's notice detailed his substantive objections to the University's responses in three areas. First, he alleged that the University is either withholding or has spoliated the ADOSH records that the Court ordered it to disclose. (*Id.* at 3.) Second, he alleged the University is either withholding or has spoliated "monitoring results for 40% formaldehyde exposure." (*Id.*) Third, although he accepted the University's certification that it has produced all medical records it obtained from his medical providers, Mr. Gage noted that, because the medical records contained in Exhibit 8 to the University's original summary judgment motion were filed under seal, he has been unable to access them on the docket. (*Id.* at 4.)

On May 19, 2025, the University filed a response to Mr. Gage's motion, which reiterated that the University produced all responsive documents in its possession and asked the Court to award it its attorney fees. (Doc. 119-1.)

The Court interpreted Mr. Gage's notice as an attempt to raise a discovery dispute and, therefore, set a telephonic conference to discuss the matter pursuant to the Court's standard discovery dispute resolution procedure.[2] (Doc. 125; Doc. 18 at 3.) During the call,

---

[2] During this telephonic conference, Mr. Gage spent a considerable amount of time disputing the Court's characterization of his "Notice of Non-Compliance" as a motion to compel. It is apparent from the record, however, that Mr. Gage raised his disagreements with the adequacy of the University's discovery responses in a document titled "Notice of Non-Compliance" to avoid the fee-shifting ramifications of filing a motion to compel, should such a motion have been unsuccessful. Regardless of the label Mr. Gage chose to

the University agreed to *again* send Mr. Gage a complete copy of all medical records the University had obtained from Mr. Gage's medical providers, and to provide Mr. Gage with any emails between ADOSH and the University during the relevant time that were not previously disclosed and which concerned the issues Mr. Gage had raised in his FOIA request. The Court also ordered that Exhibit 8 to the University's original summary judgment motion be made available to Mr. Gage. (Doc. 125.)

During this telephonic conference, Mr. Gage also made clear for the first time that his main objection to the University's recent discovery responses was more about form than substance. At bottom, Mr. Gage objected that the University had produced documents based on the descriptions of the categories of documents in the Court's order, without the need for Mr. Gage to formally serve RFPs. Mr. Gage asked the Court to permit him to formally serve such requests, evidently so he could more precisely describe the documents he was seeking.[3]

The Court obliged. It authorized Mr. Gage to serve the University with the RFPs that he had apparently intended to serve based on the Court's prior order. And the Court directed the University, in responding to such requests, to indicate if any documents are being withheld and, if so, to provide the reason why. (Doc. 125.)

Mr. Gage thereafter served his RFPs  (Doc. 127), and the University responded (Doc. 128). Within days, the Court received an email from Mr. Gage indicating that he wished to raise with the Court some issues with the University's production. The Court authorized Mr. Gage to raise those issues in a written motion. (Doc. 129.)

On July 14, 2025, Mr. Gage filed the motion to compel at issue, accompanied by

---

give his filing, this much is clear: Mr. Gage believed the University had not adequately complied with its discovery obligations and he raised those issues with the Court, presumably with the expectation that the Court examine the issue and, if appropriate, order the University to comply. That is the functional equivalent of a motion to compel.

[3] Although the University seems to have believed it would be more efficient for it to disclose documents based on the description of those documents in the Court's order, nothing prevented Mr. Gage from voicing his disagreement with that streamlined procedure and serving formal RFPs at that time. Instead, it appears Mr. Gage acquiesced to this alternative procedure until he was dissatisfied with the University's document production, and even then, he alluded to this procedural issue for the first time in a single sentence of his "Notice of Non-Compliance," and developed it fully for the first time during the resulting telephonic discovery conference.

sixteen exhibits spanning 342 pages. (Docs. 130, 130-1–130-4, 134.) The University responded and attached two exhibits of its own, spanning 141 pages. (Docs. 135, 135-1–135-2.) Mr. Gage replied. (Doc. 136.) After a careful review of the parties' submissions, the Court is ready to rule.

### B. Legal Standard

The Federal Rules of Civil Procedure permit discovery:

> regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). A requesting party may move to compel a discovery response if a responding party provides "an evasive or incomplete disclosure," which is "treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4). "Resolution of a motion to compel discovery is a matter within the Court's discretion." *Miller v. York Risk Servs. Grp.*, No. CV-13-01419-PHX-JWS, 2014 WL 12656714, at *2 (D. Ariz. June 23, 2014).

The party moving to compel a discovery response "bears the burden of establishing the information sought is relevant," *Id.*, and to show that the responding party has materially failed to comply with its discovery obligations, *see Comair Limited v. Boeing Co.*, Case No. C23-176 RSM, 2024 WL 4696125, at *2 (W.D. Wash. Nov. 6, 2024). After all:

> [discovery] is akin to an honor system. [Courts] trust that attorneys uphold their professional obligations and responsibilities by following the Federal Rules of Civil Procedure to produce relevant, nonprivileged information, after a reasonable inquiry, that is within their client's possession, custody, and control. . . . If second-guessing was the norm, the whole discovery system would break down into an endless barrage of motions based on mistrust about the opponent's production.

*LKQ Corp. v. Kia Motors Am., Inc.*, 345 F.R.D. 152, 156 (N.D. Ill. 2023). Consequently, "courts do not grant motions to compel based solely on speculation that the responding

1  party has incorrectly asserted that all responsive documents have been produced," or based

2  on "mere suspicion that additional documents exist[.]" *Moran v. Pak*, Case No.: SACV 16-

3  00705-CJC(DFMx), 2017 WL 11632943, at *2 (C.D. Cal. Jan. 4, 2017) (internal quotations

4  and citations omitted).

5  ### C. Discussion

6  Before addressing the merits of Mr. Gage's motion to compel, the Court offers a

7  word on relevance. On May 2, 2025, the Court re-opened discovery for a *narrow* purpose:

8  to permit Mr. Gage to serve on the University RFPs for a limited category of documents

9  that Mr. Gage alleged were potentially relevant to his case and had not yet been fully

10  produced. (Doc. 112.) The Court did not re-open discovery wholesale. For purposes of the

11  present motion, the Court evaluates relevance with reference to the limited categories of

12  documents that the Court previously permitted Mr. Gage to seek. That means it is Mr.

13  Gage's burden to (1) show that the documents he seeks are relevant to his case and within

14  the scope of the documents the Court authorized him to request and (2) establish in a non-

15  speculative way that the University has materially failed to comply with its production

16  obligations.

17  ### 1.  Mr. Gage's First Supplemental RFP

18  In his first supplemental RFP, Mr. Gage asked the University to:

19  > [p]roduce in original context, all documents regarding
20  > communications between [the University] and [ADOSH] that
> refer to or involve Mr. Gage's Injury/Disability or could be
21  > relevant to matters involved in this case. This includes
> specifically, but not limited to, any email communications with
22  > any agent, any formaldehyde testing(s) or reports of injury sent
> to those agents, as well as any correspondence with previous
> ADOSH director Jessie Atencio.
23

24  (Doc. 130-1 at 12.)

25  In response, the University first stated that "it previously produced the complete

26  investigative file obtained from [ADOSH] regarding Complaint Inspections 1285981 and

27  1329433, relating to [Mr. Gage's] allegations of formaldehyde exposure." (*Id.*) The

28  University confirmed that it had produced those documents to Mr. Gage "in the exact

1    manner in which [they] were received by" the University, and that the University had not

2    redacted or altered those documents. The University identified those previously produced

3    documents by Bates number. (*Id.*)

4        Next, the University explained that it withheld unredacted versions of certain of

5    those documents, as reflected on its privilege log, because the redacted portions involve

6    internal communications with in-house legal counsel for purposes of legal analysis and

7    advice. The University confirmed that it did not redact any external communications with

8    ADOSH, and that to the extent any such redactions exist, they presumably were made by

9    ADOSH not by the University. (*Id.* at 12–13.)

10        The University then stated that, after a reasonably diligent inquiry, it was producing

11    at Bates numbers Gage 0001652–1860 communications between ADOSH and the

12    University relating to Mr. Gage's allegations of formaldehyde exposure. The University

13    identified a series of those documents that were being produced for the first time.

14    According to the University, those documents previously were withheld because they

15    "constitute irrelevant communications and transmittals." "The remaining documents

16    contained in" the document production "were previously produced to [Mr. Gage] during

17    discovery," and were "being re-produced . . . for completeness." The University also

18    certified "[f]or avoidance of doubt" that it "is not withholding any responsive documents

19    that are known to be in its possession, custody, or control relating to" Mr. Gage's

20    allegations of formaldehyde exposure. (*Id.* at 13.)

21        Finally, the University stated that on February 9, 2022, it received a notice that Mr.

22    Gage had filed a whistleblower complaint with ADOSH. The University produced a copy

23    of that notice, but not any subsequent communications between the University and ADOSH

24    related to Mr. Gage's whistleblower complaint because they post-dated Mr. Gage's

25    termination by nearly four years and the commencement of this lawsuit by nearly three

26    years, and because the University deemed them irrelevant to the sole remaining claim in

27    this case.

28

In his motion to compel, Mr. Gage contends that responsive documents "are still missing." (Doc. 130 at 7.) He also argues that communications between ADOSH and the University regarding Mr. Gage's whistleblower complaint should be produced. (*Id.* at 7–8.) The Court addresses each perceived deficiency in turn.

### i.    Allegedly Missing Documents

The University certified in its response to Mr. Gage's RFP that it is not withholding any responsive ADOSH-related documents, nor has it redacted any external communication with ADOSH. (Doc. 130-1 at 13.) It is Mr. Gage's burden to show that the University has withheld or improperly redacted relevant and responsive ADOSH documents. He has not done so.

Mr. Gage's primary accusation is that the University has either redacted certain emails or withheld certain emails and/or their attachments. To carry his burden, the Court would have expected Mr. Gage to (1) provide the documents that the University disclosed and (2) cite by Bates-labeled page to specific emails that, in his view, contain improper redactions or that reference attachments or allude to other responsive emails that were not provided. But Mr. Gage did not even supply the Court with the versions of these ADOSH documents that the University produced. Before providing Mr. Gage with ADOSH-related documents, the University Bates labeled these records. (Doc. 135-2 at 14.) If Mr. Gage had supplied the Court with the versions of the documents the University had produced to him, those documents would have included those Bates labels at the bottom of each page. At Exhibit B to his motion to compel, Mr. Gage provides the Court with ADOSH-related documents that contain no Bates labels, which indicates that these documents are *not* the same documents that the University produced and, instead, were obtained by Mr. Gage from some other source (perhaps directly from ADOSH in response to Mr. Gage's FOIA request). (Doc. 130-1 at 19–36.) Consequently, Mr. Gage cannot attribute the redactions in Exhibit B to the University.

Even with reference to Exhibit B, the motion to compel fails to cite to any specific page numbers that contain allegedly improper redactions or omissions. The only email Mr.

1   Gage describes with any specificity is an email exchange "from Dr. Brower to ADOSH

2   investigator Richard Jackson on January 11, 2018," which Mr. Gage claims was produced

3   only in redacted form and without the accompanying attachments. (Doc. 130 at 7.) But this

4   accusation is demonstrably untrue. The University provided Mr. Gage with an unredacted

5   version of this email exchange, which is Bates-labeled Gage 0001151–52, as part of the

6   University's mandatory disclosures. (Doc. 135-1 at 103–104; Doc. 135-2 at 14.) The

7   University also produced the attachments to the email exchange.[4] (Doc. 135-1 at 3–6, 13–

8   14–100; Doc. 135-2 at 14.) Mr. Gage also alludes generically to "emails from managers

9   Justin Griffin, Gaves, and Ciway" that "are either missing attachments or contain

10  redactions." (Doc. 130 at 7.) But Mr. Gage fails to cite the Court to any Bates-labeled pages

11  so that the Court can verify whether the versions of these emails produced by the University

12  reference attachments or contain redactions. Mr. Gage fails even to cite the Court to the

13  specific pages in Exhibit B where these allegedly redacted emails can be found.[5]

14      Mr. Gage also asserts that the University must be withholding documents because

15  none of the Occupations Safety and Health Administration ("OSHA") workplace injury

16  logs that the University produced "list [Mr.] Gage's injury or reports." (Doc. 130 at 7.) The

17  _____

18  [4] In his reply, Mr. Gage attempts to raise doubt about the adequacy of the University's document production by noting that these attachments are not located near the

19  emails. (Doc. 136 at 3.) This argument is unpersuasive. The emails are Bates-labeled Gage 0001151–52. The University identifies the attachments as Gage 0000600-03, 0000893-894,

20  0001073-1122, and 0001037-1072. The mere fact that the attachments do not *immediately* precede or follow the emails does not show that they are not, in fact, the attachments. Mr.

21  Gage also notes that the emails themselves do not identify the number of attachments. But this just proves that Mr. Gage is speculating about the existence of other, undisclosed attachments.

22  [5] For the first time in his reply brief, Mr. Gage itemizes five ADOSH emails (or series of emails) for which he claims the University has withheld attachments, along with

23  one email that he says alludes to the existence of another email that the University has not disclosed. (Doc. 136 at 3–4.) These citations do not help Mr. Gage for two reasons. First,

24  Mr. Gage cites only to where these emails appear in Exhibit B, but (as already explained) that exhibit does not include the Bates-labeled versions of these documents, meaning they

25  are not the versions produced to Mr. Gage by the University. The Court therefore cannot verify Mr. Gage's accusation that the University did not include the attachments for these

26  emails. Second, Mr. Gage provides these citations for the first time in his reply brief and, in so doing, has deprived the University of a fair opportunity to address those specific

27  accusations by, for example, supplying the Court with or directing it to the Bates-labeled pages showing the relevant attachments. For this reason, the Court does not consider issues

28  or arguments developed for the first time in a reply brief. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

- 14 -

University responds that "[t]his omission is unsurprising, as it is [the University's] position that [Mr.] Gage never experienced any reportable exposure." (Doc. 135 at 6.) Nonetheless, the University once again certifies that "it has not withheld any OSHA logs relating to [Mr.] Gage." (*Id.*) Mr. Gage's speculation that other documents must exist is not a sufficient basis for granting a motion to compel, *Moran*, 2017 WL 11632943, at \*2, and the Court "cannot compel [the University] to produce documents that do not exist," *Perkins v. Angulo*, No. 18CV850-DMS-LL, 2020 WL 3960510, at \*2 (S.D. Cal. July 13, 2020).[6]

### ii.    Whistleblower complaint

The record shows that in April 2018, Mr. Gage filed a complaint with ADOSH accusing the University of retaliating against him for complaining to ADOSH about formaldehyde exposure. (Doc. 130-1 at 41–48.) Nearly four years later, on February 9, 2022, the University received a letter from ADOSH notifying it that Mr. Gage had filed the whistleblower complaint and soliciting a response. (*Id.* at 38–40.) The University provided Mr. Gage with a copy of this notice, but declined to provide any subsequent communications it might have had with ADOSH regarding Mr. Gage's complaint. (*Id.* at 13–14.)

The Court agrees with the University that communications between it and ADOSH regarding Mr. Gage's whistleblower complaint are not relevant to the sole remaining claim in this case. First, because the University received notice of Mr. Gage's whistleblower complaint in February 2022—nearly four years after Mr. Gage's termination and nearly three years after the commencement of this lawsuit—any subsequent communications the University might have had with ADOSH regarding the whistleblower complaint would not materially bear on whether Mr. Gage was disabled while he was employed at the University and whether the University failed to accommodate Mr. Gage or otherwise discriminated

---

[6] Mr. Gage also claims that the University must be withholding responsive OSHA workplace injury logs because it did not include workplace injury logs for 2017 and 2018. (Doc. 130 at 7.) A review of Exhibit J to Mr. Gage's motion to compel, however, shows that Mr. Gage is in possession of OSHA workplace injury logs for 2017. (Doc. 134 at 3–5.) As for 2018, Mr. Gage was placed on administrative leave in November 2017 and did not return to work before his termination in April 2018. (Doc. 58 at 3–4.) Mr. Gage fails to explain why OSHA workplace injury logs for 2018 are relevant to his disability discrimination claim.

against him because of that disability. What's more, Mr. Gage's whistleblower complaint alleges that the University retaliated against him for reporting his safety concerns to ADOSH. But there is no retaliation claim remaining in this case. The Court therefore will not order the University to produce its subsequent communications with ADOSH regarding Mr. Gage's whistleblower complaint because Mr. Gage has not shown that this information is relevant to his disability discrimination claim.

### 2. Mr. Gage's Second Supplemental RFP

In his second supplemental RFP, Mr. Gage asked the University to produce "monitoring exposure results for 40% formaldehyde in accordance with the Standard Operating Procedure that Mr. Gage alleges he was instructed to use." (Doc. 130-1 at 14.) The University responded that "no responsive monitoring reports exist" because the ventilation system the University installed obviated the need for such testing. The University also certified that, based on a reasonably diligent inquiry, "all other documents relating to [Mr. Gage's] alleged formaldehyde exposure that are known to be in [the University's] possession, custody, or control were previously produced during discovery." (*Id.* at 15.)

Mr. Gage has not shown that "monitoring exposure results for 40% formaldehyde" exist and are being withheld by the University. As evidence that the University was performing such monitoring, Mr. Gage cites to a January 11, 2018, email from the University to ADOSH that references formaldehyde badge readings taken on January 10, 2018. (Doc. 130 at 9; Doc. 130-1 at 19.) As an initial matter, the University previously produced to Mr. Gage a copy of this email, along with the monitoring reports referenced in it. (Doc. 135 at 8.) Nothing in the record shows that the University has withheld responsive monitoring reports in its possession. More importantly, though, this email states that "these are the first badge readings we have done[.]" (Doc. 130-1 at 19) Mr. Gage alleges that he was exposed to formaldehyde sometime in 2017, he was placed on administrative leave in November 2017, and he did not return to work prior to his termination in April 2018. Thus, the email supports the University's position that no badge

1    readings for the relevant time exist. The Court cannot compel the University to produce

2    documents that do not exist.

3    **3. Mr. Gage's Third Supplemental RFP**

4    In his third supplemental RFP, Mr. Gage asked the University to "[d]isclose all

5    statements and communications the University had with Hartford Insurance as they pertain

6    to Mr. Gage, his injuries, his disability, his medical records, his statements or any other

7    actions or subject matter involved in this case. Provide in an unredacted form." (Doc. 130-

8    1 at 15.) The University responded that "it previously produced all responsive, non-

9    privileged documents known to be in [its] possession, custody, or control." (*Id.* at 15–16.)

10   The University explained that it redacted transmittals to in-house legal counsel for purposes

11   of legal analysis and advice, as reflected on its privilege log, but that it "has not redacted

12   any external communications with the worker's compensation carrier (Hartford

13   Insurance)." (*Id.* at 16.)

14   Mr. Gage appears to take issue with the redactions the University made based on its

15   assertions of privilege. (Doc. 130 at 13.) His objections are unpersuasive.

16   The University need not produce privileged documents. *See* Fed. R. Civ. P. 26(b)(1).

17   "[T]he party asserting the privilege must make a prima facie showing that the privilege

18   protects the information the party intends to withhold." *In re Grand Jury Investigation*, 974

19   F.2d 1068, 1071 (9th Cir. 1992). In the Ninth Circuit, "a privilege log identifying the

20   attorney and client involved, the nature of the document, all persons or entities shown on

21   the document to have received or sent the document, the date the document was generated,

22   prepared, or dated, and information on the subject matter of each document [is] sufficient

23   for a party to meet its burden of demonstrating the applicability of the attorney-client

24   privilege." *Grand Canyon Trust v. U.S. Bureau of Reclamation*, No. CV–07–8164–PHX–

25   DGC, 2010 WL 457397, at *2 (D. Ariz. Feb. 5, 2010). Here, the University provided a

26   privilege log containing this information. (Doc. 130-1 at 61–63.)

27   Mr. Gage fails to show how the privilege log is deficient. Instead, Mr. Gage

28   argues—without explanation or supporting evidence—that the University is improperly

using the privilege as a sword and a shield and that the privilege "is vitiated under the crime-fraud exception[.]" (Doc. 130 at 16.) On the first point, it is true that "[a] party who affirmatively places its attorney-client communications at issue in a litigation implicitly waives the privilege" because "[t]he attorney client privilege may not be used both as a sword and shield." *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 353 (9th Cir. 2014) (internal quotations and citation omitted). But Mr. Gage fails to show or explain how the University has affirmatively placed its attorney-client communications at issue. For example, there is no indication that the University intends to rely on an advice-of-counsel defense. On the second point, although it is true that the attorney-client privilege "does not extend to communications which solicit or offer advice for the commission of a crime or fraud," *In re Grand Jury Subpoena 92-1(SJ)*, 31 F.3d 826, 829 (9th Cir. 1994) (internal quotations and citation omitted), there is no reason to believe the communications between the University and its in-house counsel fall within the scope of this exception.

Mr. Gage argues that the Court should conduct an in-camera of the unredacted documents identified in the University's privilege log. (Doc. 130 at 17.) The Court declines this request. Whether to conduct an in-camera review is within the Court's sound discretion. *See In re Grand Jury Subpoena 92-1(SJ)*, 31 F.3d at 829. Before the Court conducts an in-camera review, however, the party requesting it must articulate a good-faith factual basis to believe that an in-camera review will reveal that the privilege has been improperly invoked. *See U.S. v. Zolin*, 491 U.S. 554, 572 (1989). Here, Mr. Gage's "belief that the documents are not privileged appears to be based on little more that unfounded suspicion," which is inadequate to obtain in-camera review. *Rock River*, 745 F.3d at 353.

### 4.  Mr. Gage's Fourth Supplemental RFP

In his fourth supplemental RFP, Mr. Gage asked the University to produce or describe any documents related to the University of Arizona that the University intends to use to support its claims or defenses. (Doc. 130-1 at 16.) In response, the University reiterated that it did not intend to use any of the requested documents to support its claims

or defenses and, therefore, no production is required under the terms of the Court's prior order authorizing limited additional discovery. (*Id.*) Nonetheless, the University provided Mr. Gage with a copy of his Equal Employment Opportunity Commission charge and explained to him that additional documents related to Mr. Gage's separate case against the University of Arizona are publicly available on the docket in *Gage v. Arizona Board of Regents, et al.*, Case No. 2:21-cv-01589-ROS via PACER. (*Id.* at 16–17.)

In his motion to compel, Mr. Gage contests the University's claim that it does not intend to rely on any University of Arizona documents in this case. (Doc. 130-1 at 14.) For support, Mr. Gage cites the supplemental summary judgment brief the University filed after the first remand, to which the University attached as an exhibit a copy of the complaint Mr. Gage filed in a separate lawsuit against the Arizona Board of Regents. (*Id.*; Doc. 74-1.) Mr. Gage fails to appreciate, however, that the Court struck that exhibit (Doc. 85), and the University has now disclaimed any intent to rely on it in this case. In any event, Mr. Gage indisputably has a copy of this complaint because he was served with a copy of the University's supplemental summary judgment brief at the time it was filed. Given the University's certification that it does not intend to rely on any documents related to Mr. Gage's case against the University of Arizona, the University has adequately responded to Mr. Gage's fourth supplemental RFP.

### 5. Medical Records

Lastly, though not part of his supplemental RFPs, Mr. Gage resurrects his suspicions about whether the University has produced all medical records it obtained in this litigation. (Doc. 130-1 at 14–15.) The University has repeatedly certified that it has provided Mr. Gage with all medical records it obtained from Mr. Gage's medical providers in this matter, and the University does so again in its response to Mr. Gage's motion to compel. (Doc. 135 at 15.) It is not the University's burden to prove a negative. Mr. Gage is the party claiming that the University is withholding documents. He therefore must provide the Court with a non-speculative basis for believing this to be true. Mr. Gage has not done so.

1    **D. Conclusion**

2    For the foregoing reasons, Mr. Gage's motion to compel is denied.

3    When the Court authorized Mr. Gage to serve his RFPs, the Court also permitted

4    the parties to file limited, supplemental briefs addressing any new, material evidence

5    produced in response to those additional discovery requests. (Doc. 125; Doc. 140.) The

6    Court specified:

> [Mr. Gage's] supplemental summary judgment response brief
> shall be limited to addressing any new material produced by
> [the University] in response to [Mr. Gage's] recent discovery
> requests. This supplemental response brief shall be limited to
> 5 pages, double-spaced, in 14-point font (not including any
> evidentiary attachments). [The University] may file a
> supplemental summary judgment reply, likewise limited to 5
> pages, double-spaced, in 14-point font.
>
> . . .
>
> [Mr. Gage's] supplemental summary judgment response brief
> shall be due no later than 14 days after the Court rules on the
> pending motion to compel . . . . [The University] may file its
> supplemental summary judgment reply brief no later than 7
> days after service of [Mr. Gage's] supplemental summary
> judgment response brief

16    (Doc. 140.) Consistent with that order, to the extent Mr. Gage received any *new* evidence

17    in response to his supplement RFPs that is *material* to the issue of whether he is disabled

18    within the meaning of the ADA, he may file his supplemental summary judgment response

19    brief by no later than January 13, 2026. To be clear, this supplemental briefing is optional.

20    If Mr. Gage did not uncover any new, material evidence in response to his supplemental

21    RFPs, he is free to notify the Court in writing that he does not intend to file a supplemental

22    summary judgment response, in which case the Court will rule based on the briefing that

23    has already occurred.

24    **II.    Motion for Status Conference (Doc. 148)**

25    On December 18, 2025, Mr. Gage filed a document titled "Motion for Status

26    Conference on Defendant's New Discovery and Notice of New Fact Finding and

27    Anticipated Motions." (Doc. 148.) It seems the impetus for this motion was the

28    University's service of its Third Supplemental Mandatory Initial Discovery Responses on

December 15, 2025. (Doc. 147.) According to the University, this updated disclosure merely notified Mr. Gage of "changes to the job title and/or employment status of certain potential witnesses." (Doc. 149 at 2.) The Court denies Mr. Gage's request for a status conference because Mr. Gage has not shown why such a benign supplemental disclosure would necessitate the need for a status conference or further motion practice.

The path forward in this case is clear: if Mr. Gage uncovered new, material evidence in response to his supplemental RFPs, the parties may file their limited supplemental summary judgment briefs addressing the new, material evidence. Once briefing has closed, the Court will review the parties' submissions and decide the threshold issue of whether there is a triable issue of fact regarding whether Mr. Gage is disabled under the ADA. If there is, then the Court will set a date for a trial on Mr. Gage's disability discrimination claim. If there is not, then the Court will again enter summary judgment for the University. In the meantime, nothing in this order precludes Mr. Gage from filing non-discovery-related motions if he believes, in good faith, that there is an issue the Court must resolve.[7] But the Court sees no need for a status conference at this time.

Finally, in response to Mr. Gage's motion for a status conference, the University asks the Court to issue a vexatious litigant order relieving the University of the obligation to respond to any of Mr. Gage's filings unless specifically directed to do so by the Court. (Doc. 149 at 2.) For now, the Court denies this request but reminds the parties only one claim remains to be litigated: the claim that the University discriminated against Mr. Gage because of his alleged disability. The University may raise the vexatious litigant  issue again if it believes Mr. Gage is filing frivolous motions.

**IT IS ORDERED** as follows:

1.  Mr. Gage's motion to compel (Doc. 130) is **DENIED**.

2.  Mr. Gage's motion to expedite (Doc. 142) is **DENIED** as moot.

3.  Mr. Gage's motion for a status conference (Doc. 148) is **DENIED**.

---

[7] Pursuant to paragraph 5 of the Scheduling Order (Doc. 18 at 3), the parties may not file written discovery motions without permission from the Court.

4. To the extent Mr. Gage received any new, material evidence in response to his supplemental RFPs, he may file a supplemental summary judgment response, limited to 5 double-spaced pages in 14-point font (not including any evidentiary attachments), by no later than **January 13, 2026**. Alternatively, if Mr. Gage did **not** receive any new, material evidence in response to his supplemental RFPs, he may as soon as practicable notify the Court in writing that he does not intend to file a supplemental summary judgment response. If Mr. Gage chooses to file a supplemental summary judgment response, then the University may file a supplemental summary judgment reply, also limited to 5 double-spaced pages in 14-point font, within 7 days after service of Mr. Gage's supplemental summary judgment response. The Corut will set a date for a trial scheduling conference, if appropriate, after it determines whether there is a triable issue of fact regarding whether Mr. Gage is disabled within the meaning of the ADA.

Dated this 30th day of December, 2025.

_____

Douglas L. Rayes
Senior United States District Judge